HENSLEE, MONEK & HENSLEE,
Plaintiff,

v.

D.M. CENTRAL TRANSPORTATION, INC., d/b/a Central Michigan Railway Company, Charles A. Pinkerton, III, Individually, and Daniel R. Miller, Individually, Defendants.

No. 93–CV–10312–BC.

United States District Court,
E.D. Michigan,
Northern Division.

Dec. 15, 1994.

Kevin J. O'Dowd, Brian K. Lawson, Grand Rapids, MI, for plaintiff.

John G. Bacon, Mt. Clemens, MI, for defendants D.M. Transp. and Charles Pinkerton.

Patrick D. Neering, Bay City, MI, for defendant Daniel R. Miller.

## MEMORANDUM OPINION AND ORDER

CLELAND, District Judge.

### I. Introduction

This kindness will I show—
Go with me to a notary, seal me there
Your single bond, and in a merry sport,
If you repay me not on such a day,
In such a place, such sum or sums as are
Expressed in the condition, let the forfeit
Be nominated for an equal pound
Of your fair flesh, to be cut off and taken
In what part of your body pleaseth me.[1]

This is a suit by a law firm to recover under a contingent fee agreement. The underlying lawsuit was settled—for cash and a promise of re-employment—by the client acting alone and against the firm's advice. The contract states that the law firm is entitled to 25% of "the gross amount ... realize[d] on this claim." With Shakespearian "kindness," the law firm argues that "the gross amount" includes not only the cash settlement received, but also the dollar value of all compensation connected with the re-employment. The firm thus considers itself entitled to 25% of the client's cash, plus 25% of the client's wages and 25% of the client's benefits for so long as the client remains employed with the company. The law does not support such a ravenous approach.

Accordingly, Defendants' motion for summary judgment (Document 32) is GRANTED, and Plaintiff's First Motion in Limine (Document 34) is DENIED as moot.

### II. Background

Plaintiff represented Defendant Daniel R. Miller in a suit against his then-employer Defendant D.M. Central Transportation, Inc. d/b/a Central Michigan Railway Company ("Central Michigan Railway" or "the railroad") for injuries he suffered in the course of his employment. In December 1989, Plaintiff and Miller entered into a contingent fee agreement, providing that Plaintiff shall be paid "a sum equal to 25 per cent of the gross amount I [Miller] realize on this claim." Suit was filed in March 1991, seeking $900,000 in damages on each of two counts. Sometime after the suit was filed, Miller's employment with the railroad was terminated.

In the fall of 1991, Miller met with Defendant Pinkerton, Central Michigan Railway's president, and the two negotiated a settlement which included a cash payment of $13,325 and a position of "safety coordinator and staff assistant." The job was consistent with Miller's physical limitations and paid $21,000 per year. The settlement took place independent of either party's lawyers. In a letter to attorney Van Bree of the plaintiff firm, dated October 28, 1991, Miller advised,

> You have made it very clear what my options are and what values they hold. However, what I must take into consideration is what is best for my family's future, not what personal pain I have had to endure. With taking into consideration what Mr. Pinkerton has offered against what your recommendations are, I, therefore, must choose what is best for my family.
>
> I have chosen to accept what Mr. Pinkerton has offered as opposed to further legal proceedings. I realize this is against what you have recommended, but I feel that his offer will give greater benefits in the future.

After a hearing on the record on November 15, 1991, this court issued an order dismissing the action.

Miller tendered Plaintiff 25% of the cash award, but Plaintiff returned the check, stating that it was entitled to 25% of the value of Miller's new job (i.e., 25% of his salary as long as he held the job or the present value of that sum), too. Through October 1994, Miller had received approximately $78,000 in cash, plus benefits, from his job with the defendant railroad. He recently quit that

---

1. *The Merchant of Venice*, Act I, Scene III.

job for another, higher paying managerial job.

Plaintiff's First Amended Complaint states three counts: Count I alleges breach of the contingent fee contract by Defendant Miller. Count II alleges tortious interference with business and contractual relations by Defendants Pinkerton and Central Michigan Railway. Count III seeks enforcement of and foreclosure on an attorney's charging lien against Defendants Miller and Central Michigan Railway. Plaintiff and Miller settled the claims against him for $2,000 after mediation.

### III. Standard

To grant a motion for summary judgment, the court must find that the pleadings, together with the depositions, interrogatories and affidavits on file, establish that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. A party seeking summary judgment bears the initial burdens of specifying the basis upon which it contends judgment should be granted and of identifying that portion of the record which, in its opinion, demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Thus, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. at 2554. The nonmoving party must thereafter produce specific facts demonstrating a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–248, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986).

### IV. Discussion

As an initial matter, the court notes that Michigan law applies in this diversity suit. *See Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

### A. Count II—Tortious Interference with Business and Contractual Relations, Defendants Charles A. Pinkerton and Central Michigan Railroad Company

The elements of a prima facie case of tortious interference with contractual relations are well settled:

1. The existence of a contract;

2. The breach of that contract; and

3. The defendants having instigated that breach without legal justification.

*Mich.Civ.Jur.,* 24 Torts § 13. The parties agree to the existence of a contract. The elements of breach and instigation are in dispute, though, and the court finds that neither element is fulfilled in this case.

### 1. Unjustified Instigation of Breach

■ Plaintiffs cannot fulfill the third element of tortious interference with business and contractual relations. To successfully defend against this summary judgment motion, the plaintiff must show that the defendants acted without legal justification, either unlawfully or purposely and maliciously, and that their actions are unjustified in law.

A plaintiff who alleges tortious interference with a contractual or business relationship, in order to withstand a motion for summary disposition, must allege the intentional doing of either a per se wrongful act or a lawful act with malice and unjustified in law for the purpose of invading plaintiff's contractual rights or business relationship and, in the latter instance, plaintiff must demonstrate, with specificity, affirmative acts by the interferer which corroborate the unlawful purpose of the interference.

*Mich.Civ.Jur.* 24 Torts § 13. *See also Hutton v. Roberts,* 182 Mich.App. 153, 157, 451 N.W.2d 536 (1989) *lv. den.* 434 Mich. 919 (1990), *quoting Feldman v. Green,* 138 Mich. App. 360, 360 N.W.2d 881 (1984), *lv. den.* 422 Mich. 961 (1985). An act is wrongful per se only if it is inherently wrongful or is never justified under any circumstances. *Formall, Inc. v. Community Nat'l Bank of Pontiac,* 166 Mich.App. 772, 780, 421 N.W.2d 289 (1988).

The plaintiff alleges the following in support of this element of its prima facie case:

(a) "[A] jury may conclude that defendant's refusal to discuss the availability of a job with plaintiff, and thereafter providing Miller with a job for which he had no experience, no training and seemingly no qualifica-

tions was unethical. This, combined with defendant's failure to honor plaintiff's attorney lien demonstrates Pinkerton's pattern of disdain for and abuse of the contingent fee contract." (Plaintiff's Response to Defendants' Motion for Summary Judgment, 12).

(b) During discovery in the underlying case, Plaintiff "inquired into the availability of a job" but "Defendant ignored plaintiff's inquiries." *Id.*

(c) "[A]lthough Miller started his new job in September, a settlement and release was not formally executed until November." *Id.*

(d) "[D]efendant did nothing to ensure that plaintiff's fee was paid."

■■■ These acts, taken separately or together, fall far short of the required showing of "a per se wrongful act or a lawful act with malice and unjustified in law for the purpose of invading plaintiff's contractual rights or business relationship." None of the acts complained of is wrongful per se; an act is wrongful per se only if it is inherently wrongful or is never justified under any circumstances. *Formall,* 166 Mich.App. at 780, 421 N.W.2d 289. The court disagrees with Plaintiff's statement that "providing Miller with a job for which he had no experience, no training and seemingly no qualifications was unethical," but, regardless of the ethics of an employer's entering into an employment contract that favors the employee at its own expense, "unethical" falls short of the mark. Plaintiff bears the burden of showing that the defendants' acts were unlawful or malicious **and** unjustified in law. "Unethical" conduct alone does not meet this burden. Similarly, "disdain" for contingent fee contracts is neither unlawful nor malicious and unjustified in law. Indeed, lawsuits of this ilk—and the attorney conduct they reveal— are likely to inspire disdain for contingent fee contracts even among the charitable.

Plaintiff's second assertion—that during discovery in the underlying case, the defendant ignored its inquiries into the availability of a job—also falls short of the mark. Plaintiff provides no copies of relevant interrogatories and responses; it does not assert that it ever sought a motion to compel. Of course, the court takes all disputed facts in

the light most favorable to the non-moving party. But without more, such as the timing of the responses in relation to the settlement, the court cannot infer malice on the part of the defendant railroad. Furthermore, Defendant Pinkerton was not even a party to the underlying suit, and the railroad's discovery practice can hardly show malice on Pinkerton's part.

The court is also unpersuaded to find malice and legal unjustifiability in the plaintiff's statement, "[A]lthough Miller started his new job in September, a settlement and release was not formally executed until November." Though the court takes the allegation as true, it finds it irrelevant to the issue of the defendants' malice or the unjustifiability of their conduct.

The fourth allegation, that the defendants did nothing to ensure that plaintiff's fee was paid, is also irrelevant because it is not an act. Michigan law clearly requires a plaintiff to allege "either a per se wrongful act or a lawful act with malice and unjustified in law." In the latter instance, the plaintiff is required to demonstrate "affirmative acts by the interferer." An omission—failure to ensure that the plaintiff's fee was paid—is not an affirmative act.

■■ The defendants' act of settling the lawsuit—even if done with malice—is not unjustified in law or per se wrongful so as to constitute an actionable tort. In a very similar case, the Michigan Supreme Court held that an attorney hired under a contingent fee arrangement had no action in tort against an insurance company that settled the attorney's client's case against it independent of the attorney. *Krause v. Hartford Accident & Indemnity Co.,* 331 Mich. 19, 49 N.W.2d 41 (1951). In *Krause,* the plaintiff was an attorney who contracted with Mr. and Mrs. Paquin to represent them on a contingent fee basis in their claims for damages allegedly suffered through the negligence of a driver who was insured by the defendant, Hartford Accident & Indemnity Co. Shortly before Mrs. Paquin's case came to trial, adjusters from the insurance company, without knowledge of the plaintiff (the attorney), allegedly induced the Paquins "to discharge plaintiff and thereby break their contingent-fee con-

tract with him." *Id.* at 21, 49 N.W.2d 41. The Paquins hired another attorney and settled their damages with the insurance company, which knew of the contingent-fee contract. The plaintiff brought the suit against the insurance company for intentional interference with contractual relations; the trial court granted the insurance company's motion to dismiss; and the Michigan Supreme Court affirmed. The Supreme Court noted, "notwithstanding plaintiff's contingent-fee contract, Mr. and Mrs. Paquin had a right to settle their claims for damages sustained incident to the automobile accident." *Id.* at 23, 49 N.W.2d 41. "Under their contract with plaintiff, the Paquins in the instant case, . . . , had the right to settle their claims. And it was the privilege of the defendant herein to negotiate with the Paquins for the purpose of reaching a settlement." *Id.* at 26–27, 49 N.W.2d 41. "[I]f the defendant in the instant case was privileged to interfere with the contingent-fee contract between plaintiff and the Paquins, the fact that the privilege was exercised without proper motive does not take away the privilege character of defendant's act." *Id.* at 25, 49 N.W.2d 41. The present case is closely analogous to *Krause;* thus, the defendants were privileged to negotiate with Miller for the purpose of reaching a settlement.

Because the defendants were acting to further their legitimate business interests, as well as, perhaps coincidentally, Miller's interests, they are not liable to the plaintiff for tortious interference with business relations. "[D]efendants motivated by legitimate personal and business reasons are shielded from liability against this cause of action." *Formall, Inc. v. Community Nat'l Bank of Pontiac,* 166 Mich.App. 772, 780, 421 N.W.2d 289 (1988). Settling a lawsuit is a legitimate business reason because there is a strong public policy in favor of settling lawsuits prior to trial. *Krause* recognized this when it noted, "[T]he overwhelming weight of authority is in support of the proposition that any agreement by a client with his attorney prohibiting the former from settling pending litigation without the attorney's consent is void as against public policy." *Krause,* 331 Mich. at 26, 49 N.W.2d 41. Just as public policy would strongly encourage Miller to

settle, it would encourage the party with whom he must settle—Defendants—to negotiate a settlement.

Therefore, the plaintiff's have failed to raise a genuine issue of material fact on the element of unjustified instigation of breach, and summary judgment in favor of the defendants on Count II is appropriate.

## 2. Breach of Contract

■ The court has already determined that summary judgment is appropriate on Count II because the third element of the tort, unjustified instigation of breach, has not been shown. The second element, breach of contract, is analyzed as well because the plaintiff must show breach of contract to recover under either count at issue.

The appropriate starting point to determine whether there has been a breach of the parties' contingent fee agreement is the contract language itself. The contract is a short form provided by Plaintiff with blanks filled in longhand. It is dated December 14, 1989 and states in its entirety:

DEAR SIR:

I hereby employ you to handle my claim against Central Michigan Railway Co. for injury sustained by myself on 3–9–88, 3–22–88, and 7–5–89, and I agree that you are to be paid as your fee a sum equal to 25 per cent of the gross amount I realize on this claim. I further agree to pay all medical and litigation costs, if any. No settlement is to be made without my consent and you are to make no charge if I fail to recover anything on this claim. I acknowledge receipt of the original of this contract.

Miller then signed the contract, as did a representative of the law firm under the words, "We Hereby accept employment in this case on the above terms." The question the court must determine is whether "the gross amount I [Miller] realize on this claim" includes the cash value of the job obtained in settlement, which Plaintiff asserts is the salary the job pays.

This court finds that the outcome Plaintiff seeks—a holding that the present value of all salary and benefits to be paid as compensa-

tion for a job obtained through settlement is an "amount" realized on the claim—would be a vast extension of Michigan law unjustifiable in law or policy. Plaintiff cites a single case, *Maiullo v. Genematas,* 16 Mich.App. 231, 167 N.W.2d 849 (1969) for the proposition that the base amount for a contingent fee agreement includes the present value of a job. The language of that case on which Plaintiff principally relies follows: "Although this contingent fee contract speaks of 'any amount' recovered, we think those words fairly include anything of value affirmatively and actually recovered." *Id.* at 234, 167 N.W.2d 849. The item recovered in *Maiullo* was a capital stock interest in a corporation. It is quite a leap to extend the *Maiullo* court's analysis to the value of a job, which is highly subjective and far less certain in value than stock; the Michigan courts would not make such a leap, and this court will not.

What is "the value of the job"? Plaintiff argues that it is all compensation received or to be received in connection with the job. This formulation utterly ignores the value of the work performed by the employee, Miller. A job is worth the full amount of the compensation received for it only if the employee is expected to do absolutely nothing in return or if the employee's time and work are worthless, both to him and to his employer. There is no evidence presented to justify either assumption in this case. A job is a relationship which facilitates the exchange of time and physical or intellectual effort for cash or other benefits. The value of a job to its holder is the amount of compensation received minus the monetary value to him of the labor he performs. The value of a job to its provider is the benefit received from the employee's work minus the amount of compensation paid. Both of these values are positive; otherwise the parties would not have entered into the contract; they would have preferred not to trade. Basic principles of economics in a free market also tell us that the value to the worker would, over time, approach zero. If the job paid considerably more than the monetary value of the work required to be expended, a competing worker would likely come along and offer to do the same work for less money. The court holds that although the job in question is some-

thing of value received by Miller in settlement of his claim against the defendants, it is not, as a matter of law, an "amount" realized on the claim under the contingent fee agreement.

First, Plaintiff's construction of the word "amount" offends common sense. A job is not an amount.

Second, the court notes that the contact must be construed against its drafter, Plaintiff. The canon of construction *contra preferentem* requires the court to construe the terms of a contract against the person who prepared it. That rule is especially appropriate where, as here, the contract was drafted by and on behalf of a law firm. Though the court is less than favorably impressed with the legal abilities of the firm of Henslee, Monek & Henslee or its lawyer Van Bree, it assumes that Plaintiff could have drafted a less ambiguous contingent fee agreement if it had chosen to do so. The possibility which materialized was not unforeseeable to an organization of people trained to foresee contingencies. Indeed, Plaintiff notes in its response brief, "Miller testified in his deposition that later in 1989, he felt the need to find an attorney to protect his interests for fear that he was about to lose his job as a result of his physical limitations." (Plaintiff's Response to Defendants' Motion for Summary Judgment, 2). Certainly Plaintiff could have provided for the possibility that Miller might obtain a job in settlement of the lawsuit.

Third, the uncertainty of the job's value makes it an inappropriate subject for recovery under a contingent fee arrangement where the contract makes no provision for valuation. In Michigan, lost profits are generally not recoverable as damages because they are too speculative. *Hunter v. Baldwin,* 268 Mich. 106, 111, 255 N.W. 431 (1934). Under Plaintiff's theory, an attorney could presumably levy on the monetary value of his client's peace of mind, arguing that it is "a thing of value actually recovered" upon the settlement of litigation, though Plaintiff's counsel at oral argument stated that to demand a portion of the value of peace of mind as an attorney's fee would be "unethical."

Ethics aside, to include as an "amount" realized the value of intangibles of such speculative nature would be a gross distortion of the contract's meaning and would burden the courts with increased litigation, trying to pin dollar signs on the invaluable. Just as Shylock was denied his pound of flesh because he could not assure the judge that he would take no more, Plaintiff must be denied its claim on the value of Miller's job because its value is too speculative.

Fourth, the idea that a law firm could claim 25% of a man's salary for his entire career with a particular employer because he obtained the job in partial settlement of a lawsuit is unconscionable. "Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Allen v. Michigan Bell Telephone Co.*, 18 Mich.App. 632, 638, 171 N.W.2d 689 (1969), *quoting Williams v. Walker–Thomas Furniture Co.*, 350 F.2d 445 (D.C.Cir.1965). Miller had no "meaningful choice" on the question of whether the term "the gross amount I realize on this claim" included all future compensation for a job recovered as part of a settlement because he had no reason to think that the value of a job was an "amount." Furthermore, since the contingent fee contract was drafted and proffered by the plaintiff law firm, there was an inequity of bargaining power between the parties which heavily favored Plaintiff. The contract terms, if construed as Plaintiff urges, are unreasonably favorable to the plaintiff law firm. The court doubts that anyone would voluntarily sign away 25% of the gross wages and benefits for the duration of an entire career with his or her employer, especially when the employee was supporting his family on a relatively modest salary of $21,000 per year.

The court concludes that, as a matter of law, prospective compensation for a job recovered as part of a settlement agreement is not an "amount" recovered under the terms of a contingent fee agreement under the facts presented in this case.[2] Accordingly, there has been no breach of the contingent fee agreement, and the defendants are entitled to summary judgment on Count II, tortious interference with business and contractual relations.

### C. Count III—Enforcement of and Foreclosure on Attorney's Charging Lien, Defendants Daniel R. Miller and Central Michigan Railway Company

In Count III, Plaintiff seeks to enforce an attorney's charging lien against Central Michigan Railway.

There can be no dispute that Michigan common law creates a lien held by an attorney on the fund resulting from the attorney's services. *Mich.Civ.Jur.* 15 Liens § 9.50. Similarly, there can be no dispute that a lien would be enforceable against the railroad. The lien is enforceable against a third party if the third party has actual notice of the lien or "unless circumstances known to the third party are such that he or she should have inquired as to the claim of the attorney." *Id.* The railroad had actual knowledge of the lien; the plaintiff served them with a notice of attorney's lien.

Thus, the real dispute is not whether there is a valid lien but whether there is any fund to which the lien would attach. Because the court has determined that Miller did not breach his contract[3] with the plaintiff, there is nothing to which Plaintiff's lien may attach.

Accordingly, the defendants are entitled to summary judgment on this count. Plaintiff's First Motion in Limine is denied as moot.

**2.** Plaintiff's counsel expressed concern at oral argument that a defendant might use a job offer to perpetrate fraud on a law firm, paying a large "salary" to an employee-plaintiff for little or no work. While this court would not approve of such conduct, this case presents no evidence whatsoever that the compensation for Miller's work was grossly out of proportion to the work he performed or that the employment contract was less than legitimate. Miller was paid $21,-

000 plus benefits for his full-time employment as a safety coordinator and staff assistant.

**3.** The court notes that Miller tendered to the plaintiff 25% of the cash portion of the settlement, and the plaintiff rejected it. Therefore, the plaintiff's share of the cash settlement is not in dispute in this suit.

## V.  Conclusion

Summary judgment is granted in favor of the Defendants Central Michigan Railway and Charles A. Pinkerton on Counts II and III of their motion for summary judgment. The motion in limine is denied as moot.

IT IS SO ORDERED.